FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

99 NOV -2 PM 2: 03

U.S. DISTRICT COURT
N.D. OF ALABAMA

BRENNETTA WATKINS,      )
                                     )
     Plaintiff,          )
                                     )
     v.                )         CV 98-BU-3149-M
                                     )
ETOWAH STEELWORKERS' CREDIT  )
UNION,                    )
                                     )
     Defendant.       )

ENTERED

NOV 0 2 1999

----

### Memorandum Opinion

----

Plaintiff Brennetta Watkins filed this action against her former employer, Defendant Etowah Steelworkers Credit Union (the "Credit Union"), alleging claims of race discrimination and retaliation under both Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981, as well as an "outrage" claim under Alabama tort law. Now before the Court is a motion filed by the Credit Union for summary judgment. (Doc. No. 19). The parties have fully briefed the motion and filed evidence in support of their respective positions. The motion is now ripe for decision, and, upon due consideration, the Court concludes that the Credit Union's motion for summary judgment is due to be GRANTED IN PART AND DENIED IN PART. The motion will be granted to the extent that it seeks the dismissal of the outrage claim and the Title VII and Section 1981 "failure-to-promote" discrimination and retaliation claims based upon the teller positions awarded to Nanette Burns and Peggy Hammonds. The motion will be denied as to all other claims.

### I. SUMMARY JUDGMENT STANDARDS

Summary judgment provides the parties an invaluable opportunity to test the mettle of

*30*

a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. <u>Id</u>. at 323. The movant's burden is not meager; he must "point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). Thus, it is never enough simply to state that the non-moving party cannot meet its burden at trial. <u>Id.</u> Once the moving party has satisfied its initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." <u>Howard v. BP Oil Company</u>, 32 F.3d 520, 523 (11th Cir. 1994). Rule 56(e) requires the nonmoving party to "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exists a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324; <u>Cottle v. Storer Communication, Inc.</u>, 849 F.2d 570, 575 (11th Cir. 1988).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. <u>Anderson</u>, 477 U.S. at 254-55. "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether

such issues exist to be tried.  The Court must avoid weighing conflicting evidence or making credibility determinations."  Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir. 1993).  In making its determination, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor.  Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)).  At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'"  Tidwell v. Carter Products, 135 F.3d 1422, 1425 (11th Cir. 1998) (citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)).

## II. BACKGROUND[1]

Ms. Watkins is a black female.  She was hired as a part-time employee of the Credit Union on May 13, 1996, training for two weeks as a drive-thru teller.  Thereafter, she worked at the Credit Union's main branch in various positions, including teller and at the front desk.  Subsequently, the Credit Union hired Karen Wofford and Patsy Perry, both white females, to part-time positions.  Ms. Wofford was hired on December 7, 1996, while Ms. Perry was hired on March 10, 1997.

In November 1997, Renick Adams, the president of the Credit Union, determined that the Credit Union needed three additional full-time employees, and he selected Ms. Watkins, Ms. Wofford, and Ms. Perry to fill those slots.  The "full-time" date, i.e., the date upon which their full-time status became effective, for each of the three women was the same: November 7, 1997.  After becoming a full-time employee, Ms. Watkins worked Mondays through

---

[1]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record.  These are the 'facts' for summary judgment purposes only.  They may not be the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)."  Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

Thursdays as a telephone switchboard operator at the Credit Union's main branch. When she worked as a switchboard operator, she earned $8.54 per hour, the standard rate for that position. However, Ms. Watkins also filled in as a teller on Fridays, and for such work she received the higher standard rate for that position: $13.04 per hour.[2] When Ms. Wofford became full-time, she worked as a teller at the main branch five days per week, receiving the higher "teller" rate of pay. The parties disagree upon the position and pay that Ms. Perry received immediately upon becoming a full-time employee on November 7th. Ms. Watkins has testified that Ms. Perry was working as a teller at the Credit Union's city branch "every day" upon being hired full-time. Watkins's depo. at 67. The Credit Union, on the other hand, asserts that Ms. Perry and Ms. Watkins both worked as switchboard operators, at the city branch and the main branch, respectively, and received the same rate of pay until Ms. Perry was concededly promoted to a teller position sometime in January 1998. The Court concludes, however, that the payroll records in evidence indicate that, upon becoming full-time, Ms. Perry was initially paid for at least one week at the higher "teller" rate of pay earned by Ms. Wofford and was later paid for at least one other week at the lower "operator" rate of pay earned by Ms. Watkins.[3]

---

[2]Ms. Watkins alleges in her brief in opposition to the motion for summary judgment that tellers made $13.49 per hour, based upon the deposition testimony of Trena Arnold, the Credit Union's Assistant Controller whose duties include handling the payroll. Plaintiff's Brief at 11. Indeed, Arnold states on page 33 of her deposition that she "believed" that tellers made that amount at the time in question. Ms. Watkins herself said, by contrast, that she made $13.03 per hour when she worked as a teller. Watkins depo. at 65-66. However, the Court notes that payroll records indicate that tellers earned $13.041 per hour. That is the "rate-of-pay" listed on Plaintiff's Exhibit J, a check file report dated January 8, 1998, for a number of employees who undisputedly worked at that time as tellers, including Ms. Wofford and Nanette Burns.

[3]Plaintiff's Exhibit P is a printout of the Credit Union's "Payroll Computer Check Register," dated November 13, 1997, encompassing the first pay period after Ms. Watkins, Ms. Perry, and Ms. Wofford became full-time employees. It indicates that Ms. Perry and Ms. Wofford each had gross pay of $476 for the week. If this amount is divided by 36.5, representing the number of hours of the Credit Union's work week, Arnold depo. at 37, the result is $13.041 per hour, the precise rate of pay

After becoming full-time, Ms. Watkins noticed a posted seniority list indicating that her name appeared below those of Ms. Perry and Ms. Wofford, respectively, despite the fact that all three women shared the same "full-time" date. On December 18, 1997, Ms. Watkins went to Mr. Adams's office to inquire how the list was made and whether it meant she would be let go before the other two if there were a layoff. Mr. Adams acknowledged that he had made the list, and he confirmed that Ms. Watkins was considered to have less seniority and that she would, therefore, be affected adversely before Ms. Perry or Ms. Wofford in the event of a layoff. Ms. Watkins told Mr. Adams that she believed this was unfair and that she should be ahead of the other two women based upon her work performance and because she had been a part-time employee at the Credit Union longer than they had. Mr. Adams assured her that he was not attempting to punish her by placing her third on the list and that he did not have any problems with her work performance, attendance, or attitude; indeed, he told her that he had not considered job performance at all in arranging the women's names on the seniority list. Nor, he claimed, did he consider their initial hire dates; he told her that part-time service does not count towards seniority under the collective bargaining agreement ("CBA") between the Credit Union and the United Steelworkers of America, which represents the Credit Union's full-time non-management employees after each has completed a 90-day probationary period. Rather, Mr. Adams claimed that the arrangement of the three women on the seniority list "was just the way [he] came to it," Adams Depo. at 102, based upon the sequence that he had spoken with each of them to advise them that they would be becoming full-time employees.

---

for the tellers listed in Plaintiff's Exhibit J, including Ms. Wofford. Similarly, Ms. Watkins's gross pay is listed on Plaintiff's Exhibit P as $311.71, which divided by 36.5 hours is $8.54 per hour, the exact rate of pay Ms. Watkins testifies that she made as a switchboard operator and the rate of pay appearing for her on Exhibit J. Thus, it appears that Ms. Wofford and Ms. Perry both made the "teller" rate of pay for the week of November 7-13, 1997 while Ms. Watkins made less. However, Plaintiff's Exhibit J, dated January 8, 1998, indicates that Ms. Perry and Ms. Watkins were each paid at the rate of $8.54 per hour.

After speaking with Mr. Adams, Ms. Watkins sought out Steve Burgess, the union steward who represented the tellers who were members of the union.  Although she had not expressly raised the issue of race in her meeting with Mr. Adams, Ms. Watkins told Mr. Burgess that she believed she was placed last on the seniority list and was given the lowest paying job among the three women because she was black.   She then asked Mr. Burgess if he would go and speak to Mr. Adams on her behalf.  Mr. Burgess expressed some hesitation about doing so because Ms. Watkins was not a union member and had not completed her 90-day probationary period, but he ultimately agreed to pass on to Mr. Adams what Ms. Watkins had said to him.

On the morning of December 22, 1997, Mr. Burgess did as he said he would, telling Mr. Adams that Ms. Watkins had said that she believed she was placed in the lowest paying job and last on the seniority list among the three women because of her race.  Mr. Adams replied that he would look into the matter.  At about 4:20 p.m. the same day, Mr. Adams called Ms. Watkins into his office.  He told her that, as a result of his conversation with Mr. Burgess that morning, it was his understanding that Ms. Watkins was dissatisfied with the answer Mr. Adams had given her regarding the order of the seniority list.  Ms. Watkins acknowledged that this was the case.   Mr. Adams then warned her as follows:

> "You are still a probationary employee. . . .  We are under no obligation to keep
> you as a permanent employee during this 90-day period.   If you are dissatisfied
> with the job or working conditions or the answers that you have been given then
> maybe it's the thing for you to do to look for another job. . . .  I don't want to
> have an employee that is going to be a constant disagreement."

Plaintiff's Exh. O at 1.  Although Ms. Watkins's 90-day probationary period would not expire until February 8, 1998, Mr. Adams told her that he would be requesting that the union allow it to be extended an additional 30-days, thus prolonging the time Ms. Watkins would become eligible for union membership.  After the meeting, Mr. Adams filed a formal request to extend

Ms. Watkins's probationary period by 30 days, which was granted by the union.[4]

Several weeks later, the Credit Union posted openings for three positions at its branch in Rainbow City, Alabama. On January 12, 1998, two available teller positions were posted, and on February 3, 1998, an opening was posted for a loan area secretary. Ms. Watkins applied for all three positions by signing her name to the posted notices, but she did not receive any of the positions. The two teller positions were assumed by Nanette Burns and Peggy Hammonds, white females who undisputedly had more seniority than Ms. Watkins and were already working as tellers before moving to the Rainbow City branch. The loan area secretary position went unfilled. It also appears that there was a third teller position at the Rainbow City branch that was never posted but was assumed by Ms. Wofford.[5]

On February 18, 1998, Ms. Watkins was summarily terminated after being told that her employment "just wasn't working out." Watkins Depo. at 107. This termination decision was made by Mr. Adams. The following day, she was replaced by Julie McCain, a white female who had been working as a part-time employee.

Ms. Watkins filed this action on December 18, 1998, claiming that the Credit Union discriminated against her based upon race and retaliated against her because of her opposition

---

[4]Once an employee becomes a member of the union, she would be covered by the CBA, which provides for a hearing and an arbitration grievance procedure before an employee is finally discharged. Defendant's Exh. 2 at 11. No such protections attend non-union employees, which includes those who are still on their probationary period.

[5]Ms. Watkins alleges in her deposition that on the same day Ms. Burns and Ms. Hammonds were awarded teller positions at Rainbow City, Ms. Wofford was also moved to a teller position at that branch. Watkins Depo. at 37-38. The Credit Union disputes this, claiming that Plaintiff's allegation is contradicted by the statement in her brief that a third position went unfilled at Rainbow City. However, there is no contradiction in acknowledging that the loan area secretary position at Rainbow City went unfilled while also alleging that a third, unposted teller position at that branch was assumed by Ms. Wofford. In any event, it is undisputed that only two teller positions at Rainbow City were ever posted, and the parties agree that Ms. Wofford did apply for them. The Court concludes that, for purposes of summary judgment, the Credit Union has failed to establish that it is undisputed that there was not a third, unposted teller position filled by Ms. Wofford.

to racial discrimination, in violation of Title VII and Section 1981.  More specifically, Ms. Watkins alleges claims of race discrimination based upon the following actions of the Credit Union:  (1) placing her on the seniority list behind Ms. Perry and Ms. Wofford; (2) placing her in the telephone switchboard operator position, which allegedly paid less than the positions awarded to Ms. Perry and Ms. Wofford; (3) failing to promote her to a teller position at the Rainbow City Branch, of which she alleges there were three available; (4) failing to promote her to the loan area secretary position at the Rainbow City Branch; and (5) terminating her employment.[6]  The latter three actions also form the basis of retaliation claims.  In addition, she claims that the Credit Union retaliated against her by extending her probationary period an extra 30 days.  Finally, she asserts that the actions underlying her discrimination and retaliation claims constitute the tort of outrage under Alabama state law.

### III.  CONTENTIONS & ANALYSIS

#### A.  Outrage Claim

In Count IV of her complaint, Ms. Watkins asserts a claim for the tort of outrage under Alabama state law.  In its narrative statement of facts in support of its motion for summary judgment, however, the Credit Union alleges that the outrage claim has been "voluntarily dismissed."  Defendants Brief at 10.  This assertion is based upon statements made at Ms. Watkins's deposition by her attorney to defense counsel to the effect that the outrage claim

---

[6]Ms. Watkins unquestionably has alleged claims that the Credit Union terminated her employment in violation of the anti-retaliation components of Title VII and Section 1981.  See Complaint ¶ 12 ("Plaintiff was terminated on February 18, 1998, in retaliation for her opposition to racial discrimination . . . .).  It also appears, however, that her complaint encompasses Title VII and Section 1981 claims that the Credit Union terminated her employment on the basis of her race.  See Complaint ¶ 15 ("Plaintiff has been discriminated against and treated differently than similar situated (sic) white employees solely because of her race. . . . This treatment by the defendant has affected the terms, condition (sic) and enjoyment of plaintiff's employment and led, in part, to her termination.") (Emphasis added).  While the Credit Union's motion seeks summary judgment on the retaliation claims as they pertain to Ms. Watkins's discharge, it does not address the claims that she was discriminatorily discharged.

would be so dismissed.  Watkins Depo. at 114-115.  However, there has never been a motion
to dismiss the outrage claim, nor has this Court entered an order dismissing it.  In any case, on
page six of Ms. Watkins's response to the Credit Union's narrative summary of the facts she
has expressly "[a]dmitted" that this claim has been dismissed.  Further, the evidence submitted
indicates that Ms. Watkins's allegations, even if true, do not indicate actions on the part of the
Credit Union that are sufficiently egregious to support an outrage claim under Alabama law.
See Bell v. Eufaula City Bd. of Educ., 995 F.Supp. 1377, 1387 (M.D. Ala. 1998).
Accordingly, the Credit Union's motion for summary judgment is due to be granted insofar as
it seeks the dismissal of Ms. Watkins's outrage claim.

>B. Discrimination Claims Under Title VII and Section 1981

Ms. Watkins claims that the Credit Union discriminated against her on the basis of race
in violation of Title VII and Section 1981.  Title VII prohibits an employer from
"discriminat[ing] against any individual with respect to his compensation, terms, conditions,
or privileges of employment, because of such individual's race, color, religion, sex, or national
origin."  42 U.S.C. § 2000e-2(a)(1).  Section 1981 guarantees to all persons in the United
States "the same right ... to make and enforce contracts ... as is enjoyed by white citizens."  42
U.S.C. § 1981(a).  Following the passage of the Civil Rights Act of 1991, the term "make and
enforce contracts" is broadly defined as including "the making, performance, modification, and
termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions
of the contractual relationship." 42 U.S.C. § 1981(b). Thus, both Title VII and Section 1981
prohibit an employer from discriminating against employees on the basis of race, and both
statutes require the same proof to show liability.  Standard v. A.B.E.L. Services, Inc., 161 F.3d
1318, 1330 (11th Cir. 1998).  The Court will, therefore, address Ms. Wilkins's Title VII
discrimination claims with the express understanding that the analysis applies to her Section
1981 discrimination claims as well.  See id.

In this case, Ms. Watkins attempts to prove her claims of discrimination based upon

circumstantial evidence.[7]  When a plaintiff offers circumstantial evidence to prove a Title VII discrimination claim, courts use the analytical framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework, the plaintiff must establish a prima facie case of discrimination, which creates a presumption of discrimination.  The employer must then offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption.  If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual.  Id., at 802-04.

### 1.  The Seniority List Discrimination Claim

The Credit Union first attacks Ms. Watkins's claim that the Credit Union discriminated against her on the basis of race by placing her on the seniority list behind Ms. Perry and Ms. Wofford, despite that the three women shared the same "full-time" date and that Ms. Watkins had the longest period of part-time service among them.  In order to establish a prima facie case on this claim, Ms. Watkins has the initial burden to show: (1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) that different treatment was given to a similarly situated employee who differs in regard to the relevant personal characteristic.  Pearson v. Macon-Bibb County Hosp. Authority, 952 F.2d 1274 (11th Cir. 1992); Marshall v. Western Grain Co., Inc., 838 F.2d 1165 (11th Cir. 1988).  The Credit Union admits that Ms. Wilkins is black and that she can thus satisfy the first element.  The Credit Union appears also to concede the third element, in that it does not dispute that the evidence indicates that both Ms. Perry and Ms. Wofford are white and were similarly situated to and afforded greater seniority than Ms. Watkins.  However, the Credit Union disputes whether Ms. Watkins can establish the second element:  an adverse employment action.

---

[7]Ms. Watkins has not presented direct evidence or statistical evidence of race discrimination, which are the other avenues by which she might have attempted to prove her Title VII discrimination claim.  See Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

Alleging that Ms. Watkins was neither laid off nor denied a promotion because of her position on the promotion list behind the two white women, the Credit Union argues that the affording of lesser seniority is not itself an adverse employment action. However, even assuming that Ms. Watkins alleged only that she was granted less seniority based upon race, such would in itself be an adverse employment action for Title VII purposes. Under the 1991 Amendments to the Civil Rights Act, "an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose in violation of this subchapter . . . when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system." 42 U.S.C. § 2000e-5(e)(2). Thus, the loss of competitive seniority rights alone is sufficient injury to support a Title VII claim. See Brunet v. City of Columbus, 1 F.3d 390, 401-02 (6th Cir. 1993). Indeed, prior to the enactment of the 1991 Amendments to the Civil Rights Act, a plaintiff who waited until she suffered a more concrete injury, such as a demotion, as an effect of the discriminatory adoption of an otherwise neutral seniority policy risked rendering her Title VII claim untimely. See Lorance v. AT & T Technologies, Inc., 490 U.S. 900 (1989). Moreover, in this case, Ms. Watkins also claims that her allegedly discriminatory placement on the seniority list behind Ms. Perry and Ms. Wofford also resulted in her receiving the lowest-paying job amongst the three. The Credit Union indeed acknowledges that Ms. Watkins and the other two women were placed in their respective positions based upon the seniority list. Thus, there is no question that Ms. Watkins has suffered an adverse employment action with respect to this claim.

The burden now shifts to the Credit Union to produce evidence indicating that it granted Ms. Watkins less seniority than Ms. Perry and Ms. Wofford for a legitimate, nondiscriminatory reason. Mr. Adams testified that he determined seniority based upon the order in which he spoke with the women to offer full-time positions. The Court concludes that this is sufficient to satisfy the Credit Union's burden of production. Thus, the initial

presumption of discrimination drops from the case, and, as so often occurs, the viability of this discrimination claim will be determined at the third and final stage of the <u>McDonnell Douglas</u> analysis: pretext.

In order to survive summary judgment, Ms. Watkins must create a genuine issue of material fact as to whether the reason advanced by the Credit Union is pretextual. <u>Bogle v. Orange County Bd. of County Com'rs</u>, 162 F.3d 653, 658 (11th Cir. 1998) (citations omitted). In other words, she must provide sufficient evidence to allow a reasonable fact finder to conclude that the proffered reason was not actually the motivation for his discharge. <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1538 (11th Cir. 1997), <u>cert. denied</u>, 118 S.Ct. 685 (1998). Ms. Watkins may do this (1) by showing that the legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. <u>Mayfield v. Patterson Pump Co.</u>, 101 F.3d 1371, 1376 (11th Cir. 1996) (quoting <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981).[8]

Ms. Watkins first claims that pretext can be inferred because, she argues, there is

---

[8]In its brief, the Credit Union argues:

"The plaintiff satisfies [her] burden [to show pretext] by establishing not only that the defendant's legitimate, non-discriminatory reason for its action was false, but also that a reasonable finder of fact could conclude that the true reason for its action was an intent on the basis of the plaintiff's race. <u>St. Mary's Honor Center v. Hicks</u>, 113 S.Ct. 2742, 2752 (1993); <u>Hawkins [v. Ceco Corp.</u>, 883 F.2d 977, 981 n.3 (11th Cir. 1989)], <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1184-85 (11th Cir. 1984). 'It is not enough . . . to <u>dis</u>believe the employer; the fact finder must <u>believe</u> the plaintiff's explanation of intentional discrimination.' <u>St. Mary's Honor Center</u>, 113 S.Ct. at 2754." Defendant's Brief at 15 (emphasis in <u>St. Mary's Honor Center</u>).

To the extent that Defendant is implying by this passage that on a motion for summary judgment a plaintiff alleging pretext must present some affirmative evidence of racial animus, such is not a correct statement of the law of this circuit. It is true that, in order for a plaintiff to ultimately recover, the trier of fact must <u>find</u> that racial discrimination is what motivated the employment decision in question. However, the trier of fact is entitled to draw the required inference of discrimination based upon evidence that merely casts <u>sufficient doubt</u> on a defendant's proffered nondiscriminatory reason. See <u>Combs</u>, 106 F.3d at 1538.

substantial evidence indicating that, under the CBA, seniority is calculated using part-time service. It is undisputed that Ms. Watkins had more part-time service than either Ms. Perry or Ms. Wofford. This indicates, Ms. Watkins argues, that she should have been awarded the greatest seniority of the three and that such casts substantial doubt upon Mr. Adams's explanation that he awarded seniority based upon the employees' order of notification. In support of her position, Ms. Watkins cites only a portion of the testimony of Steve Burgess, the union steward, wherein he states that seniority under the CBA "depended on you, like I say, year of service on the job." Burgess Depo. at 45. Ms. Watkins takes this statement to suggest that part-time service determined seniority under the CBA. However, Burgess's cited testimony is ambiguous at best. Later in his deposition Burgess expressly stated that it is his understanding that part-time work does not count towards seniority under the CBA.[9] Burgess Depo. at 49-50. Thus, Ms. Watkins argument on this ground fails.

Ms. Watkins also claims that pretext may be inferred because there is, she argues, substantial evidence indicating that the three women were notified of their full-time status in a different order than that which they appeared on the seniority list. Mr. Adams claims that he gave notice of full-time status on November 5, 1997 to Ms. Perry and then Ms Wofford, and then to Ms. Watkins on November 6, 1997. While Ms. Watkins raises disputed issues regarding both who notified her and the precise dates of notification of herself and Ms. Wofford,[10] the Court finds that these issues ultimately are not material, as she has not presented

---

[9]The Court notes that the CBA itself is ambiguous regarding the role part-time service might play in calculating seniority. Article VII of the CBA states only that seniority is determined by an employee's "continuous service" with the Credit Union. Plaintiff's Exhibit 2 at 4.

[10]Mr. Adams claims that he went by the main branch on November 5, 1997 and told Ms. Perry and Ms. Wofford of their full-time status, in that order. He maintains that Ms. Watkins was not at work that day and that he told notified her the following day, November 6, 1997. Ms. Watkins disputes that Ms. Wofford was told on November 5th, pointing to a note prepared by Trena Arnold in anticipation of Mr. Adams's deposition, where it is marked next to Ms. Wofford's name, "told her FT 11/6." However, Ms. Watkins's testimony is that she was not apprised of her own full-time

substantial evidence indicating that the order of notification is different than alleged by Mr. Adams. So she does not succeed on this basis, either.

Nonetheless, the Court concludes that there is sufficient evidence in the record to allow an inference that the explanation offered by Mr. Adams is a pretext for unlawful racial discrimination. Mr. Adams claims that he awarded seniority based upon the order in which the three employees were notified of their full-time status. He further maintains that he awarded positions to the three employees based upon seniority, as reflected by the list, and also more generally that "teller positions come about through seniority," Adams Depo. at 86. However, the evidence indicates that the only regular teller position, the highest-paying job of the three, went to Ms. Wofford, despite the fact that she was <u>second</u> on the list. From this a jury might reasonably infer that Ms. <u>Wofford</u> was considered to have the <u>most</u> seniority, despite the fact that Mr. Adams spoke with her <u>second</u>. This, the Court concludes casts sufficient doubt on the Credit Union's proffered explanation to infer pretext. Summary judgment on this claim is due to be denied.

### 2. Switchboard Operator Position Discrimination Claims

Next, the Credit Union challenges Ms. Watkins's claim that she was discriminated against by being placed in the telephone switchboard operator position, which she claims was the lowest paying position awarded herself, Ms. Perry and Ms. Wofford. There is some debate over what the elements of a prima facie case are for this claim. The Credit Union argues that Ms. Watkins must "show that she was more qualified than the white placed in the position and that whites were given preferential treatment." Defendant's Brief at 19-20. The Credit Union goes on to argue that Ms. Watkins's claim must fail because she cannot prove either of these

---

status until late in the day on November 7, 1997, when she was so notified by Ms. Arnold, who had allegedly been told by Mr. Adams that Ms. Watkins was to be full-time. However, Ms. Watkins has no independent knowledge of when the other two women were notified, and she presents no evidence indicating that she was told before Ms. Wofford.

elements.

However, it is the clear law of this circuit that the relative qualifications of a plaintiff and successful applicants are not at issue at the prima facie stage where the plaintiff brings a failure to promote or failure to hire claim under Title VII. Walker v. Mortham, 158 F.3d 1177, 1193 (11th Cir. 1998). Rather, applicants' relative qualifications are issues for steps two and three of the McDonnell Douglas analysis, and then only if the employer proffers evidence at step two indicating that it made the employment decision in question based upon the applicants' relative qualifications. Id., at 1191 & n.29. Thus, the Credit Union's argument, that Ms. Watkins must prove at the prima facie stage that she was more qualified than Ms. Perry or Ms. Wofford, is not well-taken.

The Court concludes that Ms. Watkins may establish a prima facie case on this claim under the same elements as for her previous claim: (1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) that different treatment was given to a similarly situated employee who differs in regard to the relevant personal characteristic. The Credit Union claims that Ms. Watkins cannot prove that similarly situated whites were given different treatment. The Credit Union appears to concede for purposes of summary judgment that Ms. Perry and Ms. Wofford are both similarly situated. It further admits that the evidence is undisputed that Ms. Wofford became a teller and was paid $13.01 per hour while Ms. Watkins became a telephone operator and was paid $8.54 per hour. However, the Credit Union takes the position that Ms. Watkins cannot sustain a claim even as to the teller position admittedly awarded to Ms. Wofford if Ms. Perry was awarded a position that paid the same as Ms. Watkins. See Defendants' Brief at 21 ("Plaintiff has no basis for a race discrimination claim where she was placed in the same position as one of her white comparators.") However, even assuming the Credit Union is correct in its position, which is questionable, the Court finds that the principle is inapplicable here, for there is substantial evidence indicating that Ms. Perry was also paid at the $13.01 per-hour-rate, at least initially.

See note 3, supra.

The Credit Union has presented evidence indicating that Mr. Adams decided to place the three employees in their respective positions based upon their seniority, as reflected by the list he posted. While the Court concludes that this satisfies the Credit Union's burden to proffer evidence of a nondiscriminatory reason, the Court finds that there is again sufficient evidence of pretext so as to preclude summary judgment. Again, Mr. Adams testifies that he placed the employees in their respective positions based upon the order in which he saw them and allegedly awarded them seniority. However, the evidence suggests that Ms. Wofford was awarded the best paying position, the regular teller job, even though she was seen after Ms. Perry. Thus, it is entirely unclear how the employees' seniority or the order in which the employees were allegedly seen translated into the positions they received, indicating that some other factor may have been the true motivation. Moreover, Mr. Adams's deposition testimony indicates that he did not know what particular positions he awarded to Ms. Perry or Ms. Wofford upon becoming full-time, see Adams Depo. at 62, 64-65, 76- 77, further undercutting the credibility of his explanation. Summary judgment on these claims is due to be denied.

### 3. The Rainbow City Promotion Discrimination Claims

Next, the Credit Union claims that it is entitled to summary judgment on Ms. Watkins's claims that she was denied promotions that were available at the Rainbow City branch. More particularly, Ms. Watkins claims that she was denied promotions to teller positions, of which she alleges there were three available, and that she was denied a promotion to a loan area secretary position available at that same branch. As to each position, Ms. Watkins may establish a prima facie case by presenting evidence indicating: (1) that she belongs to a racial minority; (2) that she applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite her qualifications, she was rejected; and (4) that, after her rejection, the position remained open and the employer continued to seek applicants from persons with

complainant's qualifications. <u>Schoenfeld v. Babbitt</u>, 168 F.3d 1257, 1267 (11th Cir. 1999).[11]

As an initial matter, the Court concludes that the Credit Union has not met its initial burden to show that it is entitled to summary judgment regarding the loan area secretary position. It is undisputed that this position was never filled, which, the Credit Union contends, means that this position "should thus not be an issue in this case." Defendant's Brief at 22. However, the Credit Union is mistaken. A plaintiff may succeed on a failure-to-promote or failure-to-hire Title VII claim so long as the position remains open after the plaintiffs' rejection and the employer continued to seek applicant's with a complainant's qualifications. <u>Schoenfeld</u>, <u>supra</u>. The Credit Union has alleged only that the position remained unfilled, not that it would not have considered other qualified applicants after rejecting Ms. Watkins. Nor has the Credit Union set forth any evidence indicating why it did not select Ms. Watkins, who appears to have been the only qualified applicant for the position. Thus, the Credit Union has failed to show that there are no disputed issues of material fact and that it is entitled to judgment as a matter of law on this claim. <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).

Summary judgment will similarly be denied as to Ms. Watkins's claim that she was denied a promotion to an unposted teller position that was allegedly awarded to Ms. Wofford. Ms. Watkins has alleged that Ms. Wofford did fill such a position. The Credit Union denies that this was the case, but it has not presented evidence so as to render the issue undisputed for purposes of summary judgment. <u>See</u> note 5, <u>supra</u>. And apparently because the Credit Union has not acknowledged that such a position existed, it has not advanced any other arguments to show that it is entitled to summary judgment.

In contrast, the Credit Union has claimed that it is entitled to summary judgment with

---

[11]The Credit Union has once again argued that, with respect to these failure-to-promote claims, Ms. Watkins must prove, as part of her prima facie case, that she was more qualified than the successful applicants. However, as explained in text above, this is not correct. <u>See</u> page 15, <u>ante</u>.

respect to the two posted teller positions that were filled by Nanette Burns and Peggy Hammonds, both white females.  The Court concludes that Ms. Watkins has produced sufficient evidence to establish a prima facie case as set forth above with respect to both positions.  The Credit Union has responded with an affidavit by Mr. Adams who alleges that he awarded these positions to Ms. Burns and Ms. Hammonds because they allegedly had more seniority than Ms. Watkins and he considered them to be more qualified for the positions. The burden thus shifts to Ms. Watkins to establish pretext.

Ms. Watkins acknowledges that Ms. Burns and Ms. Hammonds had both been full-time employees of the Credit Union longer than she had been.  She attempts to show pretext, however, by adhering to her position that part-time employment counts towards seniority under the CBA.  And because it is not undisputed who was hired part time first, she argues, she might show that she had more seniority than they did.  The Court disagrees.  Both Mr. Adams and Mr. Burgess testified that part-time service is not used to calculate seniority.  Ms. Watkins has failed to present substantial evidence to the contrary, so she has thus failed to show that she could be considered to have greater seniority under the CBA.  Ms. Watkins also attempts to show pretext by claiming that she was more qualified than Ms. Burns and Ms. Hammonds. However, Ms. Watkins burden at the pretext stage is not satisfied by simply presenting sufficient evidence allowing a factfinder to infer merely that she was in fact more qualified than Ms. Burns and Ms. Hammonds.  Indeed, Plaintiff's hurdle at the pretext stage is substantially higher:  she must present sufficient evidence for a jury reasonably to infer that Mr. Adams was not motivated by an honest belief that they were more qualified.  See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  Ms. Watkins merely makes a conclusory assertion that was more qualified and points to evidence showing that she, like the successful applicants, had experience as a teller.  This is insufficient to show pretext, and, as a result, the Court concludes summary judgment on these claims is due to be granted.

C.  Retaliation Claims Under Title VII and Section 1981

Ms. Watkins advances claims that the Credit Union violated Title VII and Section 1981 by allegedly retaliating against her for having voiced complaints about racial discrimination. Specifically, Ms. Watkins contends that the Credit Union retaliated against her by taking the following actions: (1) extending her probationary period an extra 30 days; (2) denying her promotions to the teller and loan area secretary positions at the Rainbow City branch; and (3) terminating her employment.

The statutory provision of Title VII that Ms. Watkins asserts prohibited the Credit Union from retaliating against her is 42 U.S.C.2000e-3(a), which recognizes two types of statutorily protected conduct. An employee is protected from retaliation if (1) "he has opposed any practice made an unlawful employment practice by [42 U.S.C. § 2000e]" (the opposition clause) or (2) "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [42 U.S.C. § 2000e]" (the participation clause). Ms. Watkins is proceeding here under the opposition clause only. The United States Court of Appeals for the Eleventh Circuit has held that retaliation claims, in a racial discrimination context, arising after the effective date of the 1991 Civil Rights Act are generally cognizable under Section 1981. See Andrews v. Lakeshore Rehabilitation Hosp., 140 F.3d 1405, 1409-13 (11th Cir. 1998). Because Ms. Watkins pursues her Title VII and Section 1981 retaliation claims as parallel causes of action, the Court will consider her Title VII retaliation claims with the understanding that such analysis applies with equal force to her Section 1981 retaliation claims, as the Court did hereinabove with Ms. Watkins's discrimination claims. See Standard, 161 F.3d at 1330; Sullivan v. National R.R. Passenger Corp., 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and section 1981 with a single analysis).

### 1.  The Probation Extension and Termination Retaliation Claims

The Credit Union admits that it extended Ms. Watkins's probationary period an extra 30 days and ultimately terminated her employment because she had continued to voice

complaints after Mr. Adams had already explained to her his position regarding her placement on the seniority list. Moreover, the Credit Union apparently acknowledges that the evidence would allow a finding that Ms. Watkins's continued complaints did involve opposition to perceived racial discrimination and that Mr. Adams was aware that such was the content of her complaints. However, the Credit Union nonetheless maintains that it is entitled to summary judgment on these claims because these adverse actions allegedly were taken not because Ms. Watkins complained about perceived racial discrimination, but rather because of the manner in which she voiced her opposition.

In support of its argument, the Credit Union relies upon Rollins v. State of Fla. Dep't of Law Enforcement, 868 F.2d 397, 398 (11th Cir. 1989), a case in which the United States Court of Appeals for the Eleventh Circuit affirmed a district court ruling against a Title VII plaintiff who claimed that she had been denied a promotion on the basis of race. In rejecting the plaintiff's claim, the district court, sitting without a jury, found that the defendant had denied the promotion based upon the manner in which the plaintiff had voiced her complaints and that this was a valid reason. On appeal, however, the plaintiff argued that regardless of the fashion in which her complaints were presented, they were protected opposition under the anti-retaliation provisions of Title VII and thus could not constitute a lawful basis for the denial of the promotion. Id. The court of appeals recognized, though, that "some otherwise protected conduct may be so disruptive or inappropriate as to fall outside the . . . protection [of the anti-retaliation provision of Title VII]," explaining further as follows:

> [I]n order to qualify for the protection of the statute, the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable. This determination of reasonableness is made on a case by case basis by balancing the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment. . . . If under this balancing test, the manner in which the employee complains is found to be unreasonable, it falls outside the protection

of the statue; the employee's conduct then may be deemed an independent basis
for [disciplinary action].

Id. at 401.  Applying this test, the court of appeals concluded that the district court's finding
that the plaintiff's conduct was not protected was amply supported, id., based upon evidence
presented at trial indicating (1) that the plaintiff "habitually bypassed the chain of command" by
going over the head of her more immediate supervisors and by failing to follow the avenues
prescribed for lodging complaints; (2) that the plaintiff had made a large number of complaints,
"most of which were plainly spurious" and which allegedly "had a damaging effect on the morale
of her unit"; and (3) that she had frequently expressed her complaints in an "insubordinate and
antagonistic manner," calling one supervisor a "fool" and accusing another of having "lied with
a straight face."  Id. at 399.

The Credit Union contends that Rollins indicates that it is entitled to summary judgment
in the instant case.  The Court disagrees.  As a threshold matter, Rollins was in a wholly
different procedural posture.  The Rollins court was reviewing the issue of whether the
employee's actions were protected based upon the district court's findings, made after a trial
on the merits, in favor of the employer; accordingly, the court of appeals was bound to view
the evidence in the light most favorable to the employer, the prevailing party.  Conversely, this
Court, at the summary judgment stage, must view the evidence here in the light most favorable
to the employee, the nonmovant.  There are cases in which the evidence shows that the manner
of an employee's opposition was so disruptive or inappropriate that a court may decide, as a
matter of law, that the employee's actions are unreasonable and therefore do not constitute
protected activity under Title VII.  See, e.g., Robbins v. Jefferson County School Dist. R-1,
186 F.3d 1253, 1259-60 (10th Cir. 1999).  But this is not such a case.  Especially when viewed
in the light most favorable to Ms. Watkins, the evidence here does not at all compel a finding
that Ms. Watkins's opposition was so disruptive or inappropriate that reasonable minds could
not find but that her actions were unreasonable.  First, there is no evidence that Ms. Watkins's

complaints were overly excessive in frequency, caused any disruption in the office, or impaired employee morale. Indeed, according to Ms. Watkins's testimony, the co-workers with whom she spoke[12] told her that they also believed that she had been treated unfairly. The Credit Union also argues that Ms. Watkins's complaints about her placement on the seniority list were spurious[13] in light of the fact that her position never caused her to be laid off as a result. However, as discussed previously, the loss of seniority rights is itself an adverse employment action for Title VII purposes, and the evidence, for the purposes of summary judgment, allows the determinations that Ms. Watkins's perception that she had been a victim of race discrimination was reasonable and her complaints made in good faith. And finally, the evidence does not reveal that Ms. Watkins exhibited anywhere near the level of antagonism or disrespect shown to supervisors in Rollins; her only alleged remark even capable of being interpreted as somewhat disrespectful was when she implied to Mr. Adams that he had not given her "straight answers" about why she was third on the seniority list. Plaintiff's Exh. O at 2. Thus, the Credit Union is not entitled to summary judgment on these retaliation claims based upon the manner of Ms. Watkins's complaints.

### 2. The Rainbow City Promotion Retaliation Claims

Ms. Watkins has asserted that the Credit Union denied her promotions to teller and loan area secretary positions that were available at the Rainbow City branch in retaliation for her

---

[12]The Court would note that Ms. Watkins suggests her workplace conversations with her co-workers somehow implicate the protections of the First Amendment. See Plaintiff's Brief at 26. This, of course, is misguided, for the First Amendment has no application to private employers such as the Credit Union. Yatvin v. Madison Metropolitan School Dist., 840 F.2d 412, 420 (7th Cir. 1988).

[13]42 U.S.C. § 2000e-3(a) shields an employee from retaliation regardless of the merit of her complaints so long as she can show a good faith, reasonable belief that the challenged employment practices violate Title VII. Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 (11th Cir. 1998).

opposition to racial discrimination. These are the same promotions that she claims she was denied on account of race. For the reasons stated previously in the context of the discrimination claims, the Credit Union's motion is due to be denied insofar as it seeks the dismissal of retaliation claims involving the unposted teller position at Rainbow City allegedly awarded to Ms. Wofford and the unfilled loan area secretary position. However, as to Ms. Watkins's claims that she was denied the promotions to the teller positions assumed by Ms. Burns and Ms. Hammonds in retaliation for her complaints, the motion for summary judgment is due to be granted. While it might be assumed that Ms. Watkins can make out a prima facie case as to these claims, she cannot establish that the reasons offered by the Credit Union for selecting the successful candidates, i.e., that they had greater seniority and were considered to be more qualified, is a pretext for retaliation.

## IV. CONCLUSION

The Court concludes that the Credit Union's motion for summary judgment is due to be granted on the following claims: (1) the outrage claim under Alabama law, (2) the Title VII and Section 1981 discrimination claims involving the Credit Union's failure to promote Ms. Watkins to either of the two posed teller positions awarded to Nanette Burns and Peggy Hammonds, and (3) the Title VII and Section 1981 retaliation claims involving those same two promotions. The Court concludes that as to those claims there are no disputed issues of material fact and the Credit Union is entitled to judgment as a matter of law. As to all other claims, the motion is due to be denied. Accordingly, the following claims set forth in the complaint remain viable in this action:

A. Title VII and Section 1981 race discrimination claims based upon:

      (1) the placement of Ms. Watkins on the seniority list after Ms. Perry and Ms. Wofford;

      (2) the placement of Ms. Watkins in a lower paying position than Ms. Perry and Ms. Wofford;

(3) the failure to promote Ms. Watkins to an unposted teller position at the Rainbow City branch allegedly awarded to Ms. Wofford;

(4) the failure to promote Ms. Watkins to the loan area secretary position at the Rainbow City branch; and

(5) Ms. Watkins's termination.

B.  Title VII and Section 1981 retaliation claims based upon:

(1) the extension of Ms. Watkins's probationary period an additional 30 days;

(2) the failure to promote Ms. Watkins to an unposted teller position at the Rainbow City branch allegedly awarded to Ms. Wofford;

(3) the failure to promote Ms. Watkins to the loan area secretary position at the Rainbow City branch; and

(4) Ms. Watkins's termination.

DONE and ORDERED this 2nd day of ~~October~~ November, 1999.


H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE

Page 24 of 24